**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
**UNITED STATES OF AMERICA**              08-cr-6007-DGL

              **v.**                                        **NOTICE OF MOTION**

**LUIS QUINTERO,**

                      **Defendant.**

────────────────────────────

**MOTION BY**:                    Anne M. Burger, Assistant Federal Public
                                  Defender, Attorney for Luis Quintero.

**DATE, TIME & PLACE**:           Before the Honorable David G. Larimer
                                  United States Courthouse, 100 State
                                  Street, Rochester, New York, at a date and
                                  time to be set by the Court.

**SUPPORTING PAPERS**:            Affirmation of Anne M. Burger, affirmed on
                                  April 14, 2020, the attachments hereto, and
                                  all prior proceedings had herein.

**RELIEF REQUESTED**:             Emergency Motion For Order Reducing
                                  Sentence/ Modifying Judgment To Allow
                                  Remainder Of Sentence To Be Served On
                                  Home Confinement Pursuant To 18 U.S.C. §
                                  3582(C)(1)(A)(i).

Dated:  April 14, 2020
        Rochester, New York

                                   /s/Anne M. Burger_____
                                  Anne M. Burger
                                  Assistant Federal Public Defender
                                  28 East Main Street, Suite 400
                                  Rochester, New York 14614
                                  585-263-6201
                                  anne_burger@fd.org
                                  Attorney for Luis Quintero

TO:    Robert Marangola, AUSA

1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **08-cr-6007-DGL** |
| **v.** | **AFFIRMATION** |
| **LUIS QUINTERO,** | |
| **Defendant.** | |

Anne M. Burger, Assistant Federal Public Defender for the Western District of New York, affirms as follows:

1.      I am an Assistant Federal Public Defender for the Western District of New York and my office was previously assigned to represent the above-named defendant, Luis Quintero on September 20, 2016. *See* Dkt. No. 29. On April 7, 2020, Chief District Court Judge Frank P. Geraci issued a Standing Order appointing the Federal Public Defender to represent individuals, like Mr. Quintero, who had previously been entitled to appointment of counsel to assess them for eligibility for compassionate release in conjunction with Section 603(b) of the First Step Act of 2018 and to file any such motion for compassionate release.[1]

2.      I submit this Affirmation in support of Luis' request for compassionate release.

---

[1] *See* Standing Order of April 7, 2020, available at
https://www.nywd.uscourts.gov/sites/nywd/files/CR-2020-
First%20Step%20Act%20Appt%20of%20FPD.pdf (last accessed April 9, 2020).

## INTRODUCTION

3.        On March 11, 2020, the World Health Organization ("WHO") officially

classified the spread of COVID-19, the disease caused by the novel coronavirus, as a pandemic.[2]

On March 13, 2020, the President of the United States declared the COVID-19 outbreak a

national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*[3] The disease

has spread rapidly, shutting schools, churches, employment and impacted every aspect of our

day-to-day lives. It may kill 200,000 citizens of the United States and infect millions.[4]

4.        Luis Quintero is among those at highest risk of serious symptoms and greater risk

of death if he is exposed to COVID-19. Luis' immune system is already weakened due to

chronic plaque psoriasis, an autoimmune disease, and his long term use of immunosuppressant

medications to treat the psoriasis. *See* PSR paragraph 67; Exhibit A, submission to BOP/MDC.

Luis also suffers from diabetes, high blood pressure and severe obesity. *Id.* Early research

demonstrates that diabetics like Luis have mortality rates more than double the overall mortality

rates from COVID-19.[5] One report concluded that "[a]mong 784 patients with diabetes, half

---

[2] "WHO Characterizes COVID-19 as a Pandemic," World Health Organization (March 11, 2020), available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last accessed 4/14/20).

[3] The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last accessed 4/14/20).

[4] Bobby Allyn, *Fauci Estimates That 100,000 To 200,000 Americans Could Die From The Coronavirus*, National Public Radio (Mar. 29, 2020), https://www.npr.org/sections/coronavirus-liveupdates/2020/03/29/823517467/fauci-estimates-that-100-000-to-200-000-americans-could-die-from-thecoronavirus (last accessed 4/14/20).

[5] *See Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, World Health Organization (Feb. 24, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (last accessed 4/13/20).

were hospitalized, including 148 (18.8%) in intensive care. That compares with 2.2% of those with no underlying conditions needing ICU treatment."[6]

5.      These statistics are grave, yet they track the footprint of the virus on members of the community who, unlike Luis, are free to practice social distancing, wear masks and gloves and purchase and use sanitizing chemicals to protect themselves from the spread of the virus. In contrast, inmates confined to prisons are kept in close contact with one another. They necessarily lack the freedom to follow social distancing recommendations, guidelines for sanitizing their surroundings or even ensuring they wear protective gear such as gloves and masks. Each day news reports detail new outbreaks of the virus in facilities that already have the virus present and first outbreaks in facilities previously believed to be COVID-19 free. For all of these reasons, Luis is unusually susceptible to contracting the most life-threatening version of the disease while housed in a crowded facility with limited ability to take necessary self-protective measures.[7]

---

[6] *See* Tom Avril, *How much diabetes, smoking, and other risk factors worsen your coronavirus odds*, Philadelphia Inquirer, Mar. 31, 2020, available at https://www.inquirer.com/health/coronavirus/coronavirus-underlying-conditions-heart-lung-kidney-cdc-20200331.html  (last accessed 4/14/20).

[7] According to the CDC, Luis falls into the category of COVID-19 because he has diabetes, is immunocompromised, and is severely obese. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed April 9, 2020). Each of these three conditions independently place Luis at high risk. The CDC has released guidelines for people at high risk like Luis:
•Stay home if possible
•Wash your hands often
•Take everyday precautions to keep 6 feet of space between yourself and others
•Keep away from people who are sick
•Clean and disinfect frequently touched surfaces.
See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/what-you-can-do.html (last accessed April 9, 2020).

6.      As a result of the intervention of the courts in the context of the COVID-19 pandemic, the Warden of the MDC has identified that 537 medically vulnerable individuals are confined in his facility. Luis is one of these 537 individuals identified by the MDC Warden. Last month, Luis and his wife each submitted a request for compassionate release in light of his medical vulnerability to the COVID-19 virus. One such request is attached as Exhibit A. Neither Luis nor his wife have received a response from the BOP.

7.      Counsel alerted the government that it would bring the instant application. In the context of these communications, the government informed counsel that the BOP no record of Luis seeking such administrative relief.

8.      Pursuant to the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A), Pub. L. No. 115-391, 132 Stat. 5194 (2018) (hereafter "FSA"), Luis respectfully requests that this Court order his compassionate release from prison.  The totality of the circumstances contributing to – and aggravating – the risk to his life and health warrant an immediate sentence reduction to time served with the roughly nine months remaining of his sentence converted to a term of home confinement. Due to its urgent nature expedited treatment of the motion is requested.

## FACTUAL BASIS

9.      Luis Quintero is a high-risk prisoner presently housed at the Metropolitan Detention Center in Brooklyn, New York.  It is reported that the MDC houses 1700 inmates.[8] Yet, as of April 3, 2020, the MDC had only tested seven of its 1700 inmates; of those, two were

---

[8] *See* Hill, J. and Barr, L., *No COVID-19 Tests Available for Prisoners at Center of New York Outbreak*, *Court Documents Sho*w, ABC News (April 4, 2020). Available at https://abcnews.go.com/Health/covid-19-tests-prisoners-center-york-outbreak-court/story?id=69969077 (last accessed 4/10/20).

positive for COVID-19. *See* Exhibit B. Six days later, the MDC had only tested an additional

four inmates yielding an additional positive test for the COVID-19 virus. *See* Exhibit C.

10.     Conditions at MDC are harsh. As of last week, inmates in Luis' housing area had

been on "lock in" for more than one week and were permitted to leave their cells only to used

shared showers and telephones every two days. Luis is locked into a cell with one other inmate.

Although he receives his immunosuppressant medication each day, at present, Luis' chronic

placque psoriasis has manifested itself in open sores that cover his body. It is impossible for Luis

to maintain the recommended cleanliness for himself and his cell because neither he nor his cell-

mate have been provided with cleaning supplies. Instead, Luis and his cell-mate are forced to

rely on bars of soap they purchased with funds on their commissary accounts to attempt to clean

their living area. Luis relates that neither he nor his cell-mate have been provided with hand

sanitizer, latex gloves or, until last Tuesday, masks. That day, Luis and his cell mate were

provided one mask each to be reused each day.

11.     Luis is in prison in connection with a conviction for violating his term of

supervised release. That supervision was imposed by this Court in a criminal case involving

violations of Title 18, United States Code, Section 924(c) and 21 United States Code, Sections

841(a)(1) and (b)(1)(C) (possession with the intent to distribute cocaine). Dkt. No. 1. Luis was

arrested in this matter originally on June 8, 2007. *Id.* On January 15, 2009, he was sentenced to

consecutive terms of 24 months imprisonment for his guilty pleas to the counts along with

concurrent terms of 5 years of supervised release. Dkt. Nos. 22 (judgment), 23 (amended

judgment). Luis pled guilty by way of a plea agreement and, in consideration for the terms of the

plea agreement, the government moved for a downward departure at sentencing pursuant to

U.S.S.G. 5K1.1. Dkt. Nos. 15 (plea agreement), 19 (departure motion). The Court granted the

government's downward departure motion and imposed the aggregate 48 months sentence to run consecutively to the 24 months sentence previously imposed in connection with an earlier sentence for conspiracy to commit bank fraud in an unrelated case. *See* 06-cr-6131 Dkt. No. 40 (judgment).[9]

12.     Luis is currently serving a 12 months sentence imposed on May 11, 2017, in connection with his guilty plea to violating his term of supervised release. Dkt. No. 36 (judgment). The Court imposed the sentence to run consecutively to a yet-to-be imposed state sentence for attempted weapons possession and declined to impose a further term of supervised release. *Id.* Not long after, Luis received a four year state prison sentence and a five-year term of post-release-supervision.

13.     According to the BOP inmate locator, Luis' release date is January 28, 2021. Following any release on the federal sentence, he will be supervised for five years by the New York State Division of Parole given he received a five-year term of state post-release supervision in connection with his state sentence.

Proposed Release Plan

14     Luis has been welcomed by his father to live with him and Luis' stepmother at 3532 Dewey Avenue in Rochester should the Court grant his application for compassionate release. Luis has a stable and supportive home with his father and step-mother where he can immediately reside on home confinement, and where he will be in a position to practice 'social

---

[9] Luis' sentence for bank fraud conspiracy under 06-cr-6131 has since elapsed. He is presently serving only a sentence in connection with 08-cr-6007.

distancing' as his father has set aside a bedroom for him. The other residents of the home are

Luis' step-mother, his aunt and uncle and Luis' adult granddaughter. Luis also has tremendous

family support to help him financially until such time as he can become gainfully employed once

non-essential workers are allowed to return to their jobs. In the long term, Luis is highly

motivated to be fully compliant with state parole supervision. He and his wife intend to apply to

the New York State Division of Parole for permission to have his state post-release supervision

term transferred to the State of Florida, where she presently lives and works. This is a time

consuming process and likely will be more time consuming given the COVID-19 pandemic.

15.     Although Luis' offense conduct was certainly serious should the Court agree to

the requested relief he will be monitored by the New York State Division of Parole and confined

to his father's home.

Plaque Psoriasis

16.     The International Psoriasis Council reported the following in mid-March:

The International Psoriasis Council (IPC) advises physicians to be alert to the
potentially harmful effects of COVID-19 infection on patients with psoriasis and
counsel all their patients on how to prevent transmission of the virus.[10]

17.     As noted above, Luis suffers from plaque psoriasis. *See* PSR paragraph 67;

Exhibit A, He is currently prescribed two immunosuppressant drugs: Otezla and Methotrexate.

*See* Exhibit A. Placque psoriasis manifests itself in "raised, red patches covered with a silvery

---

[10] *Statement on the Coronavirus (COVID-19) Outbreak*, International Psoriasis Council, March
11, 2020, available at https://www.psoriasiscouncil.org/blog/Statement-on-COVID-19-and-
Psoriasis.htm (last accessed 4/14/20).

white buildup of dead skin cells or scale. . . The [plaques] range from coin-size to palm-size. They are often itchy and painful, and they can crack and bleed."[11]

18.     Psoriasis is believed to be an immune system disorder involving malfunctioning T-cells and white blood cells.[12] The cells mistakenly attack healthy skin cells; over time, the result is skin placques or lesions. *Id*. Stress triggers a worsening of psoriasis symptoms. *Id*. Psoriasis patients are also at higher risk for obesity, high blood pressure and Type 2 diabetes. *Id*. As noted above, Luis also suffers from diabetes, high blood pressure and severe obesity. During the COVID-19-related conditions at MDC Luis has been exposed to a high degree of stress.

Diabetes

19.     Luis suffers from Type 2 diabetes. *See* Exhibit A. Like psoriasis, diabetes is believed to be an autoimmune disorder.[13] In the case of diabetes, the body's immune system causes inflammation in the fatty tissue surrounding the body's organs creating a domino effect "that leads to fatty liver disease, high cholesterol, high blood pressure and further insulin resistance throughout the body." *Id*.

---

[11] *See* National Psoriasis Foundation, available at https://www.psoriasis.org/about-psoriasis/types/plaque (last accessed 4/14/20).

[12] *See* Mayo Clinic: *Psoriasis, Patient Care & Health Information*, available at https://www.mayoclinic.org/diseases-conditions/psoriasis/symptoms-causes/syc-20355840 (last accessed 4/14/20).

[13] *See* Edgar Engleman, *Type-2 Diabetes Linked to Autoimmune Reaction in Study*. Stanford University Medicine (April 17, 2011), available at https://med.stanford.edu/news/all-news/2011/04/type-2-diabetes-linked-to-autoimmune-reaction-in-study.html (last accessed 4/14/20).

20.     As noted earlier, the CDC has identified those, like Luis, who suffer from diabetes as being at "high-risk for severe illness from COVID-19."[14]

Severe Obesity

21.     At 5 foot 6 inches tall weighing 250 pounds Luis' body mass index is 40.3. *See* PSR at paragraph 75, Exhibit A. Individuals with a body mass index of 30 or greater are obese.[15]

22.     The CDC has identified those, like Luis, who are severely obese (with a body mass index of 40 or higher) as being at "high-risk for severe illness from COVID-19."[16]

Immunosuppressant Medications

23.     Luis has been prescribed the medications Otezla and Methotrexate. These medications are immunosuppressants that can be used together or in the alternative to treat psoriasis.[17]

---

[14] *Coronavirus Disease 2019 (COVID-19) Groups at Higher Risk for Severe Illness*, Centers for Disease Control and Prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed 4/14/20).

[15] *See* N.I.H. National Heart, Lung, and Blood Institute Body Mass Index Calculator, available at https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last accessed 4/14/20).

[16] Centers for Disease Control and Prevention, *supra* note 13.

[17] *See Apremilast (Otezla). No progress in plaque psoriasis or psoriatic arthritis*, Prescrire Int., (Jun. 2016), available at https://www.ncbi.nlm.nih.gov/pubmed/27486641 (last accessed 4/14/20).

24.     The CDC has identified those, like Luis, who are immunocompromised from the long term use of "immune weakening medications" as being at "high-risk for severe illness from COVID-19."[18]

25.     Luis' circumstances – the outbreak of COVID-19 and his underlying medical conditions that place him at a high risk should he contract the disease – present "extraordinary and compelling reasons" to reduce his sentence to allow him to serve the remaining nine months under home confinement.

26.     Under 18 U.S.C. § 3582(c)(1)(A), a defendant ordinarily must exhaust administrative remedies with the BOP, or wait 30 days after submitting a request for compassionate release to the warden, whichever comes first. 18 U.S.C. § 3582(c)(1)(A). However, the court may waive these administrative exhaustion requirements, and should do so here. See, e.g., *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004). Requiring Luis to exhaust his administrative remedies would only compound the risk he will be exposed to COVID-19, a disease that has spread exceptionally quickly as shown in the table below.[19] If Luis were to contract the disease while awaiting an administrative response, it would likely come too late, leaving him in grave danger and rendering his compassionate release motion moot.

---

[18] Centers for Disease Control and Prevention, *supra* note 13.
[19] Available at https://federaldefendersny.org/ (last accessed 4/14/20). National numbers obtained from www.cdc.gov and https://coronavirus.jhu.edu/map.html.

Percentage of Increase of Infected BOP People (Inmates and Staff)

Since 3/20/2020[2]

| Date | Number of BOP Cases[3] | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of National Cases |
|------|------|------|------|------|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103,321 |
| 3/29/2020 | 38 | 1800% | 651% | 140,904 |
| 3/30/2020 | 52 | 2500% | 772% | 163,539 |
| 3/31/2020 | 59 | 2850% | 892% | 186,101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213,144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239,279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277,205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304,826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330,891 |
| 4/6/2020 | 259 | 12850% | 1897% | 374,329 |
| 4/7/2020 | 313 | 15550% | 1963% | 386,800 |
| 4/8/2020 | 377 | 18750% | 2140% | 419,975 |
| 4/9/2020 | 408 | 20300% | 2349% | 459,165 |
| 4/10/2020 | 481 | 23950% | 2527% | 492,416 |
| 4/11/2020 | 520 | 25900% | 2704% | 525,704 |
| 4/12/2020 | 541 | 26950% | 2860% | 554,849 |
| 4/13/2020 | 589 | 29350% | 2989% | 579,005 |
| 4/14/2020 | 692 | 34500% | 3042% | 489,048 |

27.     Luis respectfully moves this Court to grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by the COVID-19 pandemic in conjunction with his medical issues. The Court should issue an order reducing his sentence to time-served and allowing him to serve the remainder of his sentence on home confinement.

12

# BACKGROUND

## A.      Compassionate Release Before the First Step Act

1.       On December 21, 2018, the President signed into law the First Step Act, which, among other things, made significant changes to the statute governing compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). The statute was first enacted as part of the Comprehensive Crime Control Act of 1984 to serve as a "safety valve" to enable judges to re-assess whether a sentence reduction was warranted by factors that previously would have been addressed through the abolished parole system. S. Rep. No. 98-225, at 121 (1983).

2.       The compassionate release statute empowers courts to reduce a defendant's sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).  Congress delegated to the U.S. Sentencing Commission ("Commission") the responsibility of defining what were "extraordinary and compelling reasons." *See* 28 U.S.C. § 994(t).  In 2007, the Commission issued a guideline stating that "extraordinary and compelling reasons" include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, comm. n.1(A).

3.       As originally enacted, the statute left sole discretion for filing compassionate release motions with the Director of the Bureau of Prisons. During the span of over three decades, the BOP rarely filed motions on behalf of inmates who met the eligibility criteria. In 2013, the Department of Justice Office of the Inspector General concluded that the "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered." *See* Dept. of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (April 2013), at 11, available at https://oig.justice.gov/reports/2013/e1306.pdf  (last accessed 4/9/20); Dept. of

Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015), at 51, available at https://oig.justice.gov/reports/2015/e1505.pdf#page=1 (last accessed 4/9/20).

**B.  Compassionate Release After the First Step Act**

4.     Through the First Step Act, Congress sought to resuscitate compassionate release by, *inter alia*, allowing defendants to directly petition courts for relief, rather than leaving that power solely in the hands of the BOP.  *See* 18 U.S.C. § 3582(c)(1)(A).  The compassionate release statute, as amended by the First Step Act, authorizes courts to grant relief whenever "extraordinary and compelling reasons" warrant a reduction, consistent with the sentencing factors outlined in 18 U.S.C. § 3553(a) and applicable policy statements issued by the Commission—regardless of the BOP's position.

5.     Thus, courts no longer need to await a motion from the BOP, which tended to limit "extraordinary and compelling" circumstances to cases where the defendant suffered from a terminal illness.  Instead, courts may amend a sentence "upon motion of the defendant" after he has exhausted administrative remedies with the BOP, or after 30 days following the warden's receipt of a compassionate release request, whichever comes first. 18 U.S.C. § 3582(c)(1)(A).

6.     Considering the First Step Act's objective to increase courts' flexibility to grant compassionate release and minimize the BOP's role in the process, courts are no longer constrained by the BOP's determination of when relief is warranted. This is because those portions of the Commission's policy statement delegating to the BOP Director the power to decide what are "extraordinary and compelling reasons" are in conflict with the amended statute.

See, e.g., *United States v. Cantu*, 2019 WL 2498923, at *3-4 (S.D. Tex. June 17, 2019) (vesting BOP with authority to determine whether extraordinary and compelling reasons are present "no longer describes an appropriate use of sentence-modification provisions and is thus not part of the applicable policy statement binding the Court"); *United States v. Ebbers*, 2020 WL 91399, at *4 n.6 (S.D.N.Y. Jan. 8, 2020) ("[T]he First Step Act reduced the BOP's control over compassionate release and vested greater discretion with courts.  Deferring to the BOP would seem to frustrate that purpose").

7.      Now that power lies where Congress intended: in the courts.  And, in the one-year span since the First Step Act took effect, courts have significantly expanded the scope of compassionate release, finding "extraordinary and compelling reasons" in circumstances wholly apart from, or in combination with, the limited factors on which the BOP narrowly relied (age, medical condition, and family needs).[20]

---

[20] *United States v. Owens*, No. 97-CR-2546-CAB, ECF No. 93 at 4 (S.D. Cal. Mar. 20, 2020) (extraordinary and compelling reasons may be based on "prisoner health or family relations"); *United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020) (extraordinary and compelling reasons may be based on facts and circumstances aside from those in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C)); *United States v. Perez*, No. 88-10094-JTM, 2020 WL 1180719, at *2 (D. Kansas Mar. 11, 2020) (most district courts agree they exercise the same discretion as the BOP when reviewing a request for compassionate relief); *United States v. Young*, No. 2:00-cr-0002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (same); *United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kansas Feb. 21, 2020) (same); *United States v. Maumau*, No. 2:08-cr-0758-TC, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020) (sentence reduction may be based on extraordinary and compelling reasons other than those detailed in the application notes to the old policy statement); *United States v. Schmitt*, No. CR12-4076-LTS, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8. 2020) (Guideline § 1B1.13 cmt. n.1 does not limit court's assessment of whether extraordinary and compelling reasons exist justifying release); *United States v. Valdez*, No. 3:98-cr-0133-01-HRH, 2019 WL 7373023, at *2 (D. Alaska Dec. 31, 2019) (court no longer bound to BOP's definition of extraordinary and compelling reasons beyond application note 1(A) through (C)"); *United States v. Rodriguez*, No. 17-cr-00021-WHO-1, 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25, 2019) (in the absence of applicable policy statements, "courts 'can determine whether any extraordinary and compelling reasons other than those

8.      Now that courts are no longer constrained by the BOP's narrow interpretation of "extraordinary and compelling reasons," they have embraced their broad discretion under § 3582(c)(1)(A) to grant compassionate release.

## ARGUMENT

### A.      The COVID-19 Pandemic, Which Poses Particular Dangers to  Medically Vulnerable Inmates, Presents "Extraordinary and Compelling Reasons" that Justify Compassionate Release for Luis

1.      As noted above, on March 11, 2020, the WHO officially classified the spread of COVID-19 as a pandemic.[21]  Two days later, the President of the United States declared the COVID-19 outbreak a national emergency.[22]  Several days later, the White House issued guidance recommending that gatherings of ten or more persons be canceled or postponed.[23]

2.      In the weeks since these pronouncements, COVID-19 has continued to spread at an alarming rate.  As of April 2, 2020, nearly one million people have been infected globally and

---

delineated in U.S.S.G. 1B1.13 cmt. N.1 (A)-(C) warrant compassionate release."); *United States v. Urkevich*, No. 8:03CR37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (Application Note 1(D) may be basis for extraordinary and compelling reasons to reduce sentence); *United States v. Walker*, No. 1:11 CR 270, 2019 WL 5268752, at *2 (N.D. Ohio Oct. 17, 2019) (same); *United States v. Brown*, 411 F. Supp. 3d 446, 451 (S.D. Iowa 2019) (district court assumes the same discretion as the BOP Director when it considers a compassionate release motion); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6, 8-9 (M.D.N.C. June 28, 2019) (extraordinary and compelling reasons may be other than those identified in the application notes to the old policy statement); *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *5 (S.D. Tex. June 17, 2019) (court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief).

[21] World Health Organization, *supra* note 2.
[22] The White House, *supra* note 3.
[23] Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, New York Times (March 17, 2020), available at https://www.nytimes.com/2020/ 03/17/us/coronavirus-fatality-rate-white-house.html?action=click&module= Spotlight&pgtype=Homepage.

nearly 50,000 people have died. In the United States, more than 384,647 people have been

infected and more than 10,000 (4,738 of them New Yorkers) people have died.[24]  To stem the

spread of the disease, the CDC has broadly advised people to take basic preventive actions, such

as avoiding crowds, staying 6 feet away from others, keeping surfaces disinfected, and frequently

washing their hands or using hand sanitizer.[25]

3.      At the same time, public health experts have warned that incarcerated individuals

"are at special risk of infection" and are "less able to participate in proactive measures to keep

themselves safe."[26] Indeed, the conditions in BOP facilities provide a uniquely hospitable

environment for COVID-19 to spread.[27] Prior to March 13, 2020, when the BOP suspended

visits for 30 days, inmates regularly engaged in social, legal and medical visits with people in the

community at a time when the novel coronavirus already began to spread.[28] Even under the

present state of lockdown, inmates at the MDC must share cells, telephones and shower areas. To

make matters worse, hand sanitizer, an effective disinfectant recommended by the CDC to

reduce transmission, is deemed forbidden "contraband" in BOP facilities because of its alcohol

content.[29]

---

[24] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
[25] *Id*.
[26] "Achieving a Fair and Effective COVID-19 Response:  An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at *https://bit.ly/2W9V6oS*.

[27] Joseph A. Bick, "Infection Control in Jails and Prisons*," Clinical Infectious Diseases* 45(8): 1047-1055 (2007), available at *https://doi.org/10.1086/521910*; Vice, "Sick Staff, Inmate Transfers, and No Tests: How the U.S. is Failing Federal Inmates as Coronavirus Hits" (Mar. 24, 2020), available at *https://www.vice.com/ en_us/ article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal-inmates-as-coronavirus-hits*.

[28] "Federal Bureau of Prisons Covid-19 Action Plan," available at *https://www.bop.gov/resources/news/20200313_covid-19.jsp*.

[29] Keri Blakinger and Beth Schwarzapfel, "How Can Prisons Contain Coronavirus When Purell is Contraband?,"ABA Journal (March 13, 2020), available at

4.      Recognizing the unique risks that correctional facilities pose to both inmates and employees, members of Congress asked the BOP on March 19, 2020, to allow for the immediate release of elderly, non-violent inmates.[30]

5.      The following week, Attorney General Barr urged the Director of the BOP to prioritize home confinement for such vulnerable individuals.[31]  This occurred only in reaction to the significant outbreak in with FCI Elkton, FCI Oakdale, FCI Danbury, and FCI Oakton.[32]

6.       On March 27, 2020, more than 400 former DOJ leaders, attorneys, and federal judges sent an open letter to the President, asking that he take immediate action to reduce the population in correctional facilities to prevent the catastrophic spread of COVID-19, in particular by commuting the sentences of elderly and medically vulnerable inmates who have already served a majority of their sentence.[33] The same day, dozens of leading public health experts made a similar request, asking the President to commute the sentences of all elderly inmates, noting that these individuals are at the highest risk of dying from the disease and pose the smallest risks to public safety.[34]

---

https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus (last accessed 4/14/20).

[30] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[31] *See* https://www.themarshallproject.org/documents/6820452-Memorandum-from-Attorney-General-to-BOP-re-Home  (last accessed 4/14/20).

[32] *See* https://www.politico.com/f/?id=00000171-4255-d6b1-a3f1-c6d51b810000 (last accessed 4/14/20).

[33] *See* https://fairandjustprosecution.org/wp-content/uploads/2020/03/Letter-to-Trump-from-DOJ-and-Judges-FINAL.pdf (last accessed 4/14/20).

[34] *See* https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (last accessed 4/14/20).

7.      Despite the BOP's efforts to take precautionary measures, it is woefully unprepared to contain the virus's spread. The number of BOP staff and inmates who have tested positive for COVID-19 has increased exponentially. In one facility in Oakdale, Louisiana (where five inmates with underlying medical conditions have died), the facility no longer bothers to conduct tests. In similar vein, as of April 9, 2020, the MDC had only tested 11 of its inmates. Even limiting reliance to the reported positive tests the spread of the virus over time is startling.[35]

---

[35] Available at  https://federaldefendersny.org/ (last accessed 4/14/20). Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to question the accuracy of the reports of positive tests at MDC. Compare M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, Response to EDNY Administrative Order 2020-14 (Apr. 7, 2020) at https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf  (3 positive inmates at MDC Brooklyn) with COVID-19 Cases Federal Bureau of Prisons (Apr. 7, 2020) at www.bop.gov/coronavirus  (2 positive inmates at MDC Brooklyn).



8.     The BOP has increased Home Confinement by over 40% since March and is continuing to aggressively screen all potential inmates for Home Confinement. On April 3, the Attorney General enacted emergency authority under the CARES Act, to further increase Home Confinement. Given the surge in positive cases at select sites and in response to the Attorney General's directives, the BOP has begun immediately reviewing all inmates who have COVID-19 risk factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale,

FCI Danbury, FCI Elkton and similarly-situated facilities to determine which inmates are suitable for home confinement.[36]

9.    Courts are increasingly heeding the call from legal and medical experts by releasing elderly and vulnerable inmates from overcrowded facilities. In *United States v. Collins*, Crim. No. 10-CCB-0336, ECF 1038 (Mar. 30, 2020), a district court reduced the defendant's sentence to time-served and ordered his immediate release, stating:

> Finally, the court must acknowledge the extraordinary circumstances present in the community as a result of the COVID-19 pandemic. It is well established by public health authorities that efforts should be made to permit social distancing and minimize the risks of transmission through close contact. While it has not been proffered that Collins has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release when weighed against all the factors the court must consider, here we have, as described above, a non-violent drug offender who has already served a lengthy sentence and has been determined ready for community placement at the VOA. Collins has a home ready to receive him, where he can be placed on home confinement. While traditional location monitoring (an ankle bracelet) is not currently available, other methods of monitoring may be implemented in the discretion of the Probation Office.

Numerous other courts are in accord.[37]

---

[36] *See* https://www.bop.gov/resources/news/20200405_covid19_home_confinement.jsp (last accessed 4/14/20).

[37] *See, e.g., Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpub.) (*sua sponte* releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"); *United States v. Grobman*, No. 18-cr-20989, ECF 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted of fraud in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Kennedy*, No. 5:18-cr-20315, ECF 77 (E.D. Mich. Mar. 27, 2020) (releasing defendant after plea, despite prior revocation of release, because "COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is necessary for Defendant to prepare his pre-sentence defense"); *United States v. Mclean*, No. 19-cr-380 (D.D.C. Mar. 28, 2020) ("[T]he facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, ECF 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the COVID-19 virus and its effects in California

**B.**     **This Court Has the Authority to Reduce/Modify Luis' Sentence by Waiving the Exhaustion Requirement Because He is at Grave Risk of Contracting a Dangerous and Possibly Fatal Disease**

1.     Section 3582(c)(1)(A) imposes "a statutory exhaustion requirement" that "must

be strictly enforced." *United States v. Monzon*, No. 99 Cr. 157, 2020 WL 550220, at *2

(S.D.N.Y. Feb. 4, 2020) (citing *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004)

(internal quotation marks and alterations omitted)). "Even where exhaustion is seemingly

---

constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) ("[T]he Court is . . . convinced that incarcerating the defendant [with history of gun and drug crimes] while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) (same); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender, stating "it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez,* 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); In re *Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); In re Request to Commute or Suspend County Jail Sentences, Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in county jail "in light of the Public Health Emergency" caused by COVID-19); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (*sua sponte* inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the COVID-19 pandemic"); *United States v. Matthaei,* No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the [facility]"); *United States v. Copeland*, No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant, in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic"); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) (granting temporary restraining order and releasing high-risk plaintiffs because "[t]he nature of detention facilities makes exposure and spread of the [coronavirus] particularly harmful"); *Coronel v. Decker*, 20-cv-2472-AJN, ECF 26 (Mar. 27, 2020) (granting temporary restraining order and releasing defendant from immigration detention facility in light of COVID-19).

mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019) (citing *McCarthy v. Madigan*, 503 U.S. 140, 146–47 (1992)).2 There are three circumstances where failure to exhaust may be excused.

2.      "First, exhaustion may be unnecessary where it would be futile."." *Id*. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." *Id*. at 119. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." *Id*.

3.      All three of these exceptions apply here. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate. Finally, and obviously, [Luis] could be unduly prejudiced by such delay." *Washington*, 925 F.3d at 120–21; *see also Bowen v. City of New York*, 476 U.S. 467, 483 (1986) (waiver of exhaustion justified where delay occasioned by "the administrative process may trigger a severe medical setback"); *Abbey v. Sullivan*, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, then waiver may be appropriate."); *New York v. Sullivan*, 906 F.2d 910, 918 (2d Cir. 1990) (waiver appropriate where enforcement of exhaustion requirement would result in irreparable injury risking "deteriorating health, and possibly even . . . death"). In this case, a delay of even a week or two carries the risk of catastrophic health consequences for Luis. Given Luis' unique circumstances and the exigency of a rapidly advancing pandemic, requiring exhaustion would result in undue prejudice and render exhaustion of the full BOP administrative process both futile and inadequate.

4.      "[C]ourts should be flexible in determining whether exhaustion should be excused," *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996). Moreover, "[t]he ultimate

decision of whether to waive exhaustion . . . should also be guided by the policies underlying the exhaustion requirement." *Bowen*, 476 U.S. at 484. The provision allowing defendants to bring motions under § 3582(c) was added by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018), in order to "increas[e] the use and transparency of compassionate release." 132 Stat. 5239.

5.      Requiring exhaustion generally furthers the purpose of increasing the "use and transparency of compassionate release" because the BOP is best situated to understand an inmate's health, how it relates to the broader prison population and identify "extraordinary and compelling reasons" for release. 18 U.S.C. § 3582(c)(1)(A)(i). In Luis' case, in contrast, administrative exhaustion would defeat, not further, the policies underlying § 3582(c). Delaying relief here is tantamount to denying relief altogether Requiring Luis to pursue the administrative process by waiting for the time to run on the 30-day clock when, nearly two weeks after he requested relief the BOP reported it had no record of the request would be a futile endeavor; he is unlikely to receive a final decision from the BOP, and certainly will not see 30 days lapse before his release date. Luis asks that his sentence be modified so that he can be released now because remaining incarcerated for even a few weeks increases the risk that he will contract COVID-19. Requiring exhaustion, therefore, would be directly contrary to the purpose of identifying and releasing individuals whose circumstances are "extraordinary and compelling."

6.      Luis' serious medical problems, combined with the high risk of contracting COVID-19 in the MDC, justifies waiver of the exhaustion requirement. Under these circumstances, requiring Luis to exhaust administrative remedies, given his unique circumstances and the exigency of a rapidly advancing pandemic, would result in undue

prejudice and render exhaustion of the full BOP administrative process both futile and inadequate. When a defendant, such as Luis Quintero, is facing irreparable harm and futility if exhaustion is required, courts have waived exhaustion of administrative remedies.[38] The First Step Act did not alter this precedent; both the administrative exhaustion procedure and the circumstances meriting its waiver remain unchanged.

7.      Indeed, courts throughout the country have continued to waive the administrative exhaustion requirements under the First Step Act, where circumstances warrant.  See *Washington v. Bur. of Prisons*, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."); *United States v. Walker*, No. 3:10-cr-00298-RRB-1, ECF 110 (D. Or. Feb. 7, 2019) (finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); *see also Gurzi v. Marques*, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust

---

[38] See, e.g., *Garza v. Davis,* 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition); *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 239 n.2 (3d Cir. 2005) ("[E]xhaustion would be futile, given that Woodall is not challenging the application of the BOP regulations, but their validity."); *Elwood v. Jeter*, 386 F.3d 842, 844 n.1 (8th Cir. 2004); *Fournier v. Zickefoose*, 620 F.Supp.2d 313, 317 (D. Conn. 2009); Boucher v. Lamanna, 90 F.Supp.2d 883, 887 (N.D. Ohio 2000) (concluding that exhaustion of administrative remedies would be futile where the BOP's policy on categorizing inmate's offense as violent crime was mandatory, the issue was legal one that BOP had consistently defended, and potential for immediate release counseled timely consideration of petitioner's case); see also *Chevrier v. Marberry,* 2006 WL 3759909, *2-3 (E.D. Mich. Dec. 20, 2006); *Cushenberry v. Federal Medical Center*, 530 F.Supp.2d 908, 912 (E.D. Ky., 2008); *Zucker v. Menifee,* 2004 WL 102779, *4 (S.D.N.Y. Jan. 21, 2004); *Snyder v. Angelini*, 2008 WL 4773142, *2 (E.D.N.Y. Oct. 27, 2008); *Ross v. Fondren*, 2008 WL 4745671 (D. Minn. Oct. 29, 2008); *Kelly v. Daniels*, 469 F. Supp. 2d 903, 904 (D. Or. 2007); and *Scott v. Lindsay*, 2007 WL 2585072, at *2 (E.D.N.Y. Sept. 10, 2007).

administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather than rely on a failure to exhaust when appropriate.").

10.     Waiting for Luis to exhaust his administrative remedies while being confined in a facility where he is unable to "socially distance" himself from other inmates and correctional staff or even to sanitize his living area would compound the risk that he will be exposed to COVID-19. If Luis were to contract the disease while awaiting an administrative response, it would likely come too late, leaving him in grave danger and rendering his compassionate release motion moot.

11.     A further reason to excuse Luis' failure to exhaust all administrative remedies is that the BOP has known for months of the impending COVID-19 crisis and, thus, has had ample opportunity to adequately prepare for the emerging health crisis.[39] Because the BOP was on notice of the potential dangers to inmates in high-risk categories like Luis, it would be irrational to force him to wait while the BOP takes additional time considering an administrative request. In these extraordinary circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

---

[39] *See* https://www.usatoday.com/story/news/politics/2020/04/06/fed-prisoners-fear-virus-sue-release-troubled-prison/2954519001/ - Six chronically-ill inmates at a Oakdale, the troubled federal prison in Louisiana are suing for their release, claiming that authorities have been unable to manage a coronavirus outbreak that is "ravaging the facility" where five prisoners so far have died.  The lawsuit, filed April 6, 2020, on the inmates' behalf by the ACLU, asserted that recent Justice Department efforts to expedite releases from the Oakdale compound and at prisons in Connecticut and Ohio have not moved fast enough to identify medically-compromised and other vulnerable inmates as infections have mounted within the federal prison system. Without court intervention, the documents state that "devastating, and in many cases deadly, irreparable harm will befall incarcerated persons, facility staff, and the community."

**C.** **The Relevant § 3553(a) Sentencing Factors Warrant Reducing Luis Quintero's Sentence to Time Served / Modifying Luis Quintero's Judgment to Allow Him to Serve the Remainder of His Sentence on Home Confinement**

1.     When a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must consider the relevant sentencing factors of 18 U.S.C. §3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).

2.     Here, Luis' compromised physical health, and the unique danger he faces of contracting COVID-19 and becoming severely ill, when combined with the other Section 3553(a) sentencing factors, clearly warrant relief.  Under all of the circumstances in this case, the Court should conclude that the time that Luis has already served is sufficient to satisfy the purposes of sentencing when combined with a period of home confinement for the remainder of his prison term.

3.     In this case, like those cited above, a reduction of Luis' sentence would not diminish the seriousness of the offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—compounded by the heightened risks faced by Luis, whose ability to engage in basic self-protective measures is restricted—warrant a reduced or modified sentence.

4.     The novel coronavirus that causes COVID-19 has triggered a pandemic. The virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to individuals with underlying illnesses. Given Luis' serious health issues, he is exceptionally vulnerable to contracting the deadly disease, which constitutes "extraordinary and compelling reasons" to grant his motion for compassionate release.

27

5.      Section 603(b)(1) of the First Step Act of 2018 grants this Court discretion to reduce a sentence and order compassionate release. Luis respectfully asks that the Court reduce his sentence to time served permitting him to serve the remainder of his sentence on home confinement at his father's home.

6.      Counsel is making efforts to obtain additional records to submit in further support of this motion. Accordingly, counsel respectfully requests the ability to file a supplement this motion once that additional information is received.

7.      Due to the moratorium on transportation of prisoners due to the COVID-19, Luis waives his personal presence at any hearing and consents to appear either via videoconference/telephonically or by counsel.

**WHEREFORE,** for the foregoing reasons, Luis respectfully requests that this Court grant his Motion for Compassionate Release and modify his judgment of sentence to time served with the remainder of his term to be served on home confinement and grant such further relief as the Court deems just and proper.

Dated:   April 14, 2020
         Rochester, New York

Respectfully submitted,


   /s/Anne M. Burger
Anne M. Burger
Assistant Federal Public Defender
28 E. Main Street, Suite 400
Rochester, New York 14614
585-263-6201
anne_burger@fd.org
Attorney for Luis Quintero

To: Robert Marangola, AUSA